# Exhibit A



LAW OFFICES OF
**STEVEN G. LISA, LTD.**
A PROFESSIONAL CORPORATION

**Steven G. Lisa, Esq.**
Registered Patent Attorney
SteveLisa@PatentIt.com
Direct: (312) 320-5888

*CONFIDENTIAL – SUBJECT TO FRE 408*

June 1, 2012

**VIA FEDEX**

James Hnat
Executive Vice President, General Counsel
JetBlue Airways
118-29 Queens Blvd
Forest Hills, NY  11375

JETBLUE AIRWAYS

JUN 0 4 2012

LEGAL DEPT.

> **Re:**   *Helferich Patent Portfolio Related to Wireless Content Provision*

Dear Mr. Hnat:

This office, and that of my colleague Gerald D. Hosier, represents Helferich Patent Licensing, LLC ("Helferich") with respect to its fifty-nine (59) issued patents and pending applications including more than two thousand claims covering commercially significant developments in the fields of:

(1)   wireless content provision and messaging;

(2)   wireless/cellular handsets; and

(3)   wireless services/infrastructure.

The purpose of this letter is to provide JetBlue Airways ("JetBlue") with a detailed explanation of the scope of Helferich's patent portfolio, and to place JetBlue on notice that its activities in the field of wireless content provision and messaging (i.e., category 1, above) infringe numerous claims of Helferich's issued patents and pending applications.

Helferich has to date concluded more than one hundred and twenty-five (128) licenses under the subject patents and applications with many of the world's most sophisticated companies.  Helferich is also engaged in many ongoing licensing discussions and is signing additional agreements on a regular basis.  A current list of Helferich's non-confidential licensees is provided as Appendix 1.

The successful licensing of many of the world's largest and most aggressive companies demonstrates the merit of Helferich's infringement claims and the reasonableness of the available licensing terms for companies that respond amicably.  This is particularly true given that viable options existed for these licensees (such as using licensed vendors to operate their mobile marketing programs, or joining any of the known defense groups, etc.).  Instead of

---

P: 312.752.4357 | F: 312.896.5633 | E: info@PatentIt.com | A: 55 W. Monroe Street, Suite 3210, Chicago, IL 60603

June 1, 2012
Page 2



electing those options, leading companies that study the merit of Helferich's infringement claims have worked cooperatively to acquire amicable licenses from Helferich.

As discussed below, Helferich has also when necessary filed lawsuits against those entities that refused to address Helferich's infringement charges in good faith. A list of Helferich's lawsuits filed to date is attached as Appendix 2.[1] As indicated below, Helferich will be filing additional suits at the appropriate time against companies that: (1) refuse to address Helferich's infringement allegations in good faith, or (2) continue to infringe the patents without lawful basis. However, it is not Helferich' policy to file suit against companies that respond in good faith to address Helferich's infringement allegations.

Included with this letter are detailed claim infringement charts showing infringement of Helferich's patents by wireless content provision and messaging services such as those provided by JetBlue. This letter (and, in particular, the specific discussion of JetBlue's infringement in Section IV(B) herein) considered together with the aforementioned charts should be more than sufficient for JetBlue to conduct an efficient, yet thorough, review of the matter and to promptly reach a decision regarding a license. The accompanying claim infringement charts and supporting references, as well as other materials referenced throughout this letter and identified in Appendix 3, are available for download from our secure server as follows:[2]

> **Folder 1:** https://patentit.box.net/shared/c8x1gmnrax (Password: "helferich1")
>
> **Folder 2:** https://patentit.box.com/s/580x7ycz4svs3b3s6jx0 (Password: "WEJZZ39")

By this letter we request that JetBlue respond ***promptly*** with an indication that it will address Helferich's infringement charges in good faith. We invite JetBlue to present any meritorious defenses. Helferich agrees to fully consider JetBlue's response, to work cooperatively to determine whether JetBlue requires a license, and if so, to conclude an agreement on fair and reasonable terms. However, ***Helferich advises JetBlue that the highly favorable "pre-litigation" licensing rates will increase as additional license agreements are completed, as more Helferich patents issue, and if litigation with JetBlue is ultimately required to address the matter.***

We have also made available in Appendix 6 Helferich's form of running royalty license agreement. Helferich's form of license agreement is now fully negotiated and well established. As a result, and in fairness to existing licensees, Helferich will not agree to major substantive changes to the agreement form. However, Helferich is prepared to explain in detail each of the rights provided under the Helferich portfolio, and will establish that the license provides JetBlue with a complete resolution on reasonable terms.

## I.   THE SUBJECT PATENTS AND APPLICATIONS

Richard J. Helferich is the sole inventor of all of the patents in the Helferich portfolio and has over 25 years of experience in the development of innovative products and services for the wireless communications industry. He is a prolific inventor in this field, and his patents have

---

[1] Copies of Helferich's complaints and related filings are available from the public record.

[2] If you prefer to receive a DVD containing the referenced documents, please contact us promptly.

June 1, 2012
Page 3



yielded many tens of millions of dollars in licensing revenue over multiple licensing programs. His patents have also formed the basis of several startup and licensing companies.

In 1999, Mr. Helferich and his business partner, Martin Schwartz, founded Wireless2Web, a company focused on developing advanced mobile, wireless, and internet solutions for the messaging and entertainment industries. Messrs. Helferich and Schwartz also founded a sister company, Wireless Science, LLC, to develop, manage, and license Mr. Helferich's many inventions. Wireless2Web attempted over a period of years to develop and grow its businesses in competition with major technology companies (and, at one point, had more than thirty-five thousand subscribers). At the same time, Wireless Science attempted to license entities practicing in the fields covered by Mr. Helferich's patents. Eventually, however, it became apparent that Wireless2Web could not compete against the much larger and better-funded technology companies and, further, that many of its biggest competitors would not agree to a license in an amicable, pre-litigation, context.

Thus, in 2007, Helferich Patent Licensing, LLC was formed. Shortly after its formation, Messrs. Helferich and Schwartz exclusively licensed the portfolio to Helferich, and Helferich in turn hired this firm to aid it in its licensing and enforcement efforts. As exclusive licensee, Helferich has full authority and control of the right to grant any necessary licenses and to file litigation to enforce the subject patents and applications.

As of this writing, the Helferich portfolio includes the following forty-seven (47) issued patents:

| | | |
|---|---|---|
| 1. 8,134,450* | 17. 7,146,157 | 33. CA 2363420 (Canada) |
| 2. 8,116,743 | 18. 7,039,428 | 34. CA 2404409 (Canada) |
| 3. 8,116,741* | 19. 7,003,304 | 35. MX 264997 (Mexico) |
| 4. 8,107,601* | 20. 6,983,138 | 36. IN 244324 (India) |
| 5. 8,099,046 | 21. 6,826,407 | 37. JP 4287043 (Japan) |
| 6. 7,957,695 | 22. 6,696,921 | 38. JP 4558078 (Japan) |
| 7. 7,843,314 | 23. 6,636,733 | 39. JP 4615606 (Japan) |
| 8. 7,835,757* | 24. 6,462,646 | 40. JP 4726990 (Japan) |
| 9. 7,627,305 | 25. 6,459,360 | 41. JP 4879251 (Japan) |
| 10. 7,499,716* | 26. 6,259,892 | 42. SK 526274 (South Korea) |
| 11. 7,403,787 | 27. 6,253,061 | 43. SK 511835 (South Korea) |
| 12. 7,376,432 | 28. 6,233,430 | 44. EP 1021868 (Great Britain) |
| 13. 7,280,838* | 29. 6,097,941 | 45. EP 1046243 (Great Britain) |
| 14. 7,277,716 | 30. 6,087,956 | 46. AU 778730 (Australia) |
| 15. 7,242,951 | 31. CA 2304343 (Canada) | 47. ZA 2001/7420 (South Africa) |
| 16. 7,155,241* | 32. CA 2314182 (Canada) | |

The patents marked with an asterisk above are the subset of its issued U.S. patents that are presently asserted in this letter to be infringed by JetBlue's mobile wireless content provision and messaging. Although not addressed in detail herein, it is likely that multiple foreign patents are infringed.

June 1, 2012
Page 4



The Helferich portfolio also includes the following six (6) pending U.S. Patent Applications:

1. 13/210,223* – Filed August 15, 2011; published as Pub. No. 2011-0302615
2. 13/109,437* – Filed May 17, 2011; published as Pub. No. 2011-0217955
3. 13/109,389 – Filed May 17, 2011; published as Pub. No. 2011-0230170
4. 12/973,722* – Filed December 20, 2010; published as Pub. No. 2011-0092189
5. 12/580,189* – (Allowed) Filed October 15, 2009; published as Pub. No. 2010-0041331
6. 12/267,436 – (Allowed) Filed November 7, 2008; published as Pub. No. 2009-0191848

The applications marked with an asterisk above are the subset of its pending U.S. applications that include claims that, if issued in substantially the same form as they were filed and then published by the PTO, will be infringed by JetBlue's mobile wireless content provision and messaging.[3]

Helferich also has applications pending in the following twenty-seven (27) foreign countries (including those countries designated via the EPC):

| | | |
|---|---|---|
| 1. Canada | 11. France | 21. Sweden |
| 2. Mexico | 12. Great Britain | 22. Slovenia |
| 3. Hong Kong | 13. Denmark | 23. Lithuania |
| 4. Austria | 14. Greece | 24. Latvia |
| 5. Belgium | 15. Ireland | 25. Albania |
| 6. Germany | 16. Italy | 26. Romania |
| 7. Cyprus | 17. Luxembourg | 27. Monaco |
| 8. Switzerland and Liechtenstein | 18. Yugoslav Republic of Macedonia | |
| 9. Spain | 19. Netherlands | |
| 10. Finland | 20. Portugal | |

Helferich believes that several of these foreign applications include claims that will be infringed by some forms of content provision.

Through its continuing domestic and worldwide patent prosecution efforts, Helferich is diligently perfecting claim language, resolving claim construction issues, and obtaining new patents over the art cited by prospective licensees and litigants. ***To be clear, JetBlue should expect the license fees to continue to escalate as additional patents issue to Helferich.***

## II.   HELFERICH LICENSING, LITIGATION AND PATENT OFFICE PROCEEDINGS

Beginning in 2007, our legal team assumed responsibility for the patent prosecution, licensing, and enforcement of the Helferich portfolio.   We believe Helferich's patents and

---

[3] This letter also serves as notice for provisional damages under 35 U.S.C. § 154(d).  Under this statute, JetBlue may be responsible for provisional damages if it infringes Helferich's published claims that issue as a patent without substantive change.  Based on Helferich's track record, we are confident many of these pending claims will ultimately issue in substantially the same form in which they were published.

June 1, 2012
Page 5



pending applications form one of the most significant portfolios naming an individual inventor in recent years.  Over the past several years, we have worked with Mr. Helferich to carefully analyze the issued and pending claims, and the underlying patent specifications.  As a result, Helferich has carefully claimed the many commercially significant inventions that were clearly disclosed and described by Mr. Helferich in his patents.  Significantly, since undertaking representation, twenty-one (21) new patents have issued or been allowed worldwide, six reexaminations have been completed, and eleven (11) applications remain pending (several of which stand allowed).  Many of the issued and pending claims are infringed by commercially significant wireless content provision and messaging systems and methods as evidenced by the more than 128 licenses reported in Appendix 1.

As mentioned above, the Helferich portfolio covers several different fields of use.  Helferich's licensing and enforcement program first began with the handset (cellular phone) industry—companies such as Motorola, Apple, RIM, HP/Palm, Samsung, and LG.  Helferich began with these large, aggressive technology companies so that later prospective licensees (and particularly prospective content licensees) would: (1) know that Helferich is committed to its licensing program and the enforcement of its patents, and (2) benefit from the due diligence (including prior art searches) undertaken by the large, established technology companies, all of which have considerable expertise in the asserted fields and in defending against patent infringement charges.

In less than four years, Helferich successfully licensed **_all_** twenty-eight (28) major wireless handset manufacturers.[4]  Importantly, each handset license covers only the licensee's infringement within the handset field.  However, a few agreements (i.e., those completed with Apple, Amazon, Dell, HP/Palm, Microsoft, Motorola, and RIM[5]) also include a license for infringement within the field of mobile wireless content provision (limited to the licensee's infringement within the field of mobile wireless content provision).

In addition to signing handset companies, Helferich has for the past two years actively licensed a large number of "content provider" companies, such as JetBlue, that infringe within the wireless content provision and messaging field.  To date, Helferich has licensed over 107 such companies (across virtually every major industry segment), including agreements completed with (to name just a few): Walmart, ABInBev, Disney, Johnson & Johnson, McDonalds, eBay, Toyota, NFL, Starbucks, Amazon, and Advanced Publications.  As noted above, a list of Helferich's non-confidential licensees is included in Appendix 1.

---

[4] _See_ Appendix 1.

[5] RIM requested and acquired from Helferich additional rights relating to its indemnity obligations to its customers.  More specifically, under the terms of the Helferich-RIM Agreement, if an indemnity obligation covering any patent infringement claim exists between RIM and a prospective licensee (including JetBlue), no assertion of infringement of any such claim of the Helferich portfolio can be (and, accordingly, is being) made against the prospective licensee to the full extent that a mobile wireless communication device made by or for RIM or a wireless message service made, provided, or performed by or for RIM is involved.  Notwithstanding, and as demonstrated below, Helferich's infringement claims against JetBlue are based on JetBlue's extensive infringement and do not involve RIM's mobile wireless devices or wireless message services.

**P:** 312.752.4357 | **F:** 312.896.5633 | **E:** info@PatentIt.com | **A:** 55 W. Monroe Street, Suite 3210, Chicago, IL 60603

June 1, 2012
Page 6



We believe the large quantity and the quality of Helferich licensees serve to confirm the merit of the patents and the reasonableness of the licensing terms. Indeed, we believe the successful licensing of the entire handset industry by a single portfolio issued to an individual inventor to be unprecedented in modern patent history.

The vast majority of Helferich's license agreements were completed amicably. However, as reflected in Appendix 2, Helferich has filed lawsuits in those instances in which an infringing company responded in bad faith by ignoring Helferich, delaying resolution, or by declining a license while continuing to infringe Helferich's patents. Presently, lawsuits remain pending against the following such companies: the NBA, Nissan, JC Penney, the Arizona Republic (owned by Gannett), the Phoenix Suns, Bravo Media and G4 Media, CBS, Best Buy, and the New York Times Company.

Helferich filed its content lawsuit against the New York Times Company ("NYT") in July, 2010. NYT had been on notice of its infringement for many months and failed to either present good faith defenses or begin negotiations for a license. Shortly after filing the NYT suit, Helferich determined that NYT had organized a litigation "defense group" to collectively share information and defend against Helferich's infringement assertions. Helferich promptly informed the Court of its preference to identify and name in the existing NYT suit each of the defense group members, so as to ensure that the Court (and Helferich) would only have to conduct a single set of proceedings on common issues such as claim construction and validity.

However, in February 2011, NYT filed extensive requests for *ex parte* reexamination of three Helferich content patents (respectively, U.S. Patent Nos. 7,835,757, 7,499,716 and 7,280,838)[6] and sought a stay of the pending litigation. In effect, the reexamination requests provided NYT the opportunity to present all of its best art and arguments to the Patent Office, including new references, previously cited references, and new combinations of references not yet presented in Helferich's applications. Clearly, NYT (and its defense group) had confidence in its invalidity defenses and preferred to rely on the expert review of the Patent Office instead of proceeding with litigation. Helferich, likewise, was confident that the expert examiners at the Patent Office would confirm the validity of most, if not all, of Helferich's patent claims. Accordingly, Helferich did not oppose the requested stay of the litigation pending the initial *ex parte* reexamination requests.

The *ex parte* reexaminations of the '757, '716, and '838 patents were each substantively completed by the end of 2011, with each resolved favorably for Helferich. Specifically, after consideration of all of the art and arguments presented in the *ex parte* reexaminations as well as three later-filed *inter partes* reexamination requests (the NYT Defense Group's "second round" of reexams, discussed below), no claims were invalidated and the Patent Office confirmed as patentable a total of 313 claims in connection with the '716, '757, and '838 patents as follows.

- **U.S. Patent No. 7,280,838**: The '838 patent originally issued with 96 claims. Following reexam, the Patent Office confirmed as patentable 110 total '838 claims as follows:

---

[6] Assigned Controls Nos. 90/009,882, 90/009,880, and 90/009,883 respectively.

June 1, 2012
Page 7



- 74 in the *same substantive form as originally issued* (claims 1-6, 9-30, 36-44, and 48-84);
- 22 claims with minor clarifying amendments (claims 7, 8, 31-35, 45-47, and 85-96); and
- 14 new claims (claims 97-110).

*See* Reexamination Certificate for U.S. Patent No. 7,280,838 (3/27/2012).

- **U.S. Patent No. 7,499,716**: The '716 patent originally issued with 69 claims. Following reexam, the Patent Office confirmed as patentable 134 total '716 claims as follows:
  - 16 claims *in the same substantive form as originally issued* (claims 2, 16, 19, 20, 22, 23, 31, 34, 35, 38, 39, 43, 48, 49, 52, and 58);
  - 53 claims with what Patentee stated were non-substantive amendments that clarified rather than narrowed the claim scope (claims 1, 3-15, 17, 18, 21, 24-30, 32, 33, 36, 37, 40-42, 44-47, 50, 51, 53-57, and 59-69); and
  - 65 new claims (claims 70-134).

*See* Reexamination Certificate for U.S. Patent No. 7,499,716 (12/13/2011).

- **U.S. Patent No. 7,835,757**: The '757 patent originally issued with 20 claims. Following reexam, the Patent Office confirmed as patentable 69 total '757 claims as follows:
  - 6 claims *in the same substantive form as originally issued* (claims 1, 6, 11, 18, 19, and 20);
  - 14 claims with what the Examiner called "minor clarifying amendments" (claims 2-5, 7-10, and 12-17); and
  - 49 new claims (claims 21-69).

*See* Reexamination Certificate for U.S. Patent No. 7,835,757 (4/24/2012).

Notably, the '838 patent was confirmed not only over the three *ex parte* reexams and the three original *inter partes* reexam requests, but also over two additional *inter partes* reexamination requests filed as the NYT Defense Group's "third round" of reexaminations (discussed below).

In view of Helferich's success in the *ex parte* reexaminations, and in anticipation that Helferich would seek to lift the stay and proceed with the numerous confirmed and infringed claims, on September 6, 2011, NYT and several other accused infringers filed the second round of reexamination requests—this time *inter partes* requests—for the same patents under *ex parte* review.[7]  Joining NYT in filing those reexamination requests were: Best Buy, Bon-Ton, CBS Interactive and two NBC-controlled companies (Bravo and G4 Media).  Helferich thereafter promptly filed suit against each of the entities that joined NYT in filing the *inter partes* requests.

Again, the NYT Defense Group members must have believed that the Patent Office, with its expert examiners, was the best forum in which to present its new round of invalidity

---

[7] Assigned Control Nos. 95/001,738, 95/001,739, and 95/001,740 (for the '716, 757, and '838 patents respectively).

June 1, 2012
Page 8



arguments. However, the Patent Office promptly issued detailed orders **outright denying all three** of the group's first round of *inter partes* reexamination requests on their merit. In denying the NYT Defense Group's first round of *inter partes* reexaminations, the Patent Office stated, among other things:

> "The references set forth in the request have been considered both alone and in combination. They fail to raise a [substantial new question] of patentability as to 9-20 of the '838 patent claims. Accordingly, the request for reexamination is denied."

*See* Order Denying Request for Inter Partes Reexamination of U.S. Patent No. 7,280,838 (assigned Control No. 95/001,740), page 37.

After the NYT Defense Group filed its second round (*inter partes*) reexamination requests, Helferich promptly submitted Information Disclosure Statements citing the requests (and art and arguments presented therein) in each of the pending *ex parte* reexaminations[8] and related pending applications, including Appl. Nos. 11/598,202, 12/167,971, and 12/367,358, which are now issued and asserted herein. Since the issue fees had been paid in connection with the '971 and '358 applications, Helferich requested continuing examination of those cases to have the IDSs considered. Significantly, **_all three_** previously-allowed applications were **_again_** allowed over the *inter partes* reexamination art and arguments, and all three of these applications have now issued and are being asserted against current litigants. The '202 application issued on January 31, 2012 as U.S. Patent No. 8,107,601; the '971 application issued on February 14, 2012 as U.S. Patent No. 8,166,741; and the '358 application issued on March 13, 2012 as U.S. Patent No. 8,134,450. The '601, '741, and '450 patents include scores of additional claims relating to mobile content delivery that are presently infringed by JetBlue.

Thus, in less than nine months, the patents asserted in the NYT's lawsuit were confirmed and three additional applications were allowed over two rounds of six reexamination requests, art, and arguments. These patents and applications contain scores of original (unamended) claims as well as numerous non-substantively amended and new claims, all of which were confirmed patentable by expert examiners after express and careful consideration of prior art and invalidity arguments proffered not only in by NYT and the NYT Defense Group, but also art and arguments filed in IDSs during the reexamations supplied by, among others, the following:

1. Apple (now a licensee);
2. Motorola (now a licensee);
3. Best Buy (now a defendant);
4. Toyota (now a licensee);
5. HP (now a licensee);
6. Palm (now a licensee);

---

[8] To complete the public record, Helferich also filed a IDS citing the *inter partes* requests in the '880 reexamination, which had already received a Notice of Intent to Issue a Reexamination Certificate ("NIRC"). However, that IDS was mooted with the full denial on the merits of the '838 *inter partes* reexamination request.

June 1, 2012
Page 9



7. the NYT Defense Group in the pending litigation;

8. the NYT Defense Group in its *ex parte* reexamination requests;

9. the NYT Defense Group in its *inter partes* reexamination requests.

In short, Helferich now has seven patents to assert against infringers who continue to refuse a license, all of which will have survived ***unprecedented*** examination by the Patent Office.  To be frank, we are unaware of a portfolio of patents that has so successfully defeated so many distinct invalidity attacks by so many of the world's largest and most aggressive technology companies.

Notwithstanding this history, the NYT Defense Group members have stated their intention to continue filing reexamination requests, and to appeal any unfavorable PTO decision.  Given the favorable results to date, Helferich will also appeal any unfavorable PTO decision.  In addition, Helferich will continue to file new (necessarily narrower) claims in any reexamination proceeding to further refine and round out the full scope of claim coverage.  It is our intent to use the reexamination process to obtain the full spectrum of claims from broad to narrow.  Thus, there is no end in sight to the reexamination proceedings, and prospective licensees will need to review the record to date and form their own opinion of the likely outcome.

As expected, the NYT Defense Group members recently filed six more *inter partes* reexamination requests, marking its "third round" of reexam filings.  The latest requests are for the '241, '716, '741, '757, '838, and '601 patents.[9]  The Patent Office recently granted *inter partes* reexaminations and issued non-final office actions for the '716 patent (Control No. 95/001,867) and the '241 patent (Control No. 95/001,864).  Responses were filed in these cases on April 27, 2012 and May 14, 2012 respectively.  We will keep you up to date on our progress.

Upon receipt of the '241 and '716 reexamination requests, Helferich submitted Information Disclosure Statements citing the requests (and art and argument presented therein) in its pending reexaminations and applications.  Significantly, the "Notice of Intent to Issue Reexamination Certificate" (NIRC) relating to the '838 patent, which confirmed over 100 claims (as discussed above), shows that the examiners considered the art and arguments in the '241 and '716 *inter partes* reexamination requests filed by the NYT Defense Group.  Thus, the '838 Patent has been confirmed over ***eight*** NYT Defense Group reexamination requests.  In addition, two pending applications (Nos. 12/580,189 and 12/267,436) were allowed over these same ***eight*** NYT Defense Group reexamination requests, and Helferich recently submitted Information Disclosure Statements citing the ninth, tenth, eleventh, and twelfth reexam requests in these and other pending applications.

We address infringement in more detail below.  However, we emphasize here that many of the recently confirmed and allowed claims are infringed by JetBlue.  The allowed and confirmed claims relate to at least the following categories of content delivery, which comprise the ***vast majority*** of all mobile content delivery:

1. **Identifiers Received from an Identification Service** – Helferich asserts infringement in connection with JetBlue's messages that include

---

[9] Assigned Control Nos. 95/001,864, 95/001,867, 95/001,983, 95/001,984, 95/001,991, and 95/001,996 (for the '241, '716, '741, '757, '601, and '838 patents respectively).



identifiers received from "identification services" such as shortlink providers (e.g., Bit.ly, tinyurl.com, twitpic). *See, e.g.,* 7,835,757 confirmed claims 1, 6, 11, 24, 29, 37, 47, 52, and 60.

2. **Dynamic Content** – Helferich asserts infringement in connection with content that JetBlue causes to be updated or changed after an SMS notification is caused to be sent to a cellular phone, but before a request is received to download the content. *See, e.g.,* 7,835,757 claims 1, 19, 20, 22, 23, 24, 33, 34, 45, 46, 47, 56, 57, 68, and 69; and 8,116,741 claims 1-3, 4-9, 11-18, 20, 21, 23, 24, 26, and 27.

3. **Time Available** – Helferich asserts infringement in connection with JetBlue messages that indicate the time the identified content is available. *See, e.g.,* 7,835,757 claims 18, 21, 32, 44, 55, and 67; 7,499,716 claims 22, 23, 90, and 91; 8,116,741 claims 9 and 18; and 8,134,450 claims 1, 4, 5, 6, 13, 16, 17, 18, and 20.

4. **Error Status Information** – Helferich asserts infringement in connection with messages that include links (including, e.g., "short links" such as "bit.ly," "tinyurl," and the like) that rely on the use of error status information (e.g., HTTP status 301) to direct the recipient to a corrected location from which to download content. *See, e.g.,* 8,107,601 claims 1, 3, 4, 9-11, 16, and 17; 8,116,741 claims 11, 12, 20, 21, 23, 24, 26, and 27; and 8,134,450 claims 25, 26, 27, and 28.

In addition, during the reexamination of the '716 and '757 patents, the Patent Office found that many of Helferich's claims read onto the use in messages of identifiers that ***indirectly*** identify the content's location in messages pushed to subscribers. Helferich did not dispute that conclusion, and instead, confirmed that URLs, ***specifically including shortened URLs***, used in messages are themselves system identifiers that meet Helferich's claim requirements. For example, Helferich stated the following to the Patent Office at FN16, page 37 of the Response filed in 90/009,880 (10/5/2011): "By way of specific example, receipt in a notification message of a URL (e.g., 'www.apple.com/videos,' 'bit.ly/o4oX2E,' 'es.pn/oMz7R8,' and the like) provides the recipient information 'that establishes to the recipient the particular place or site to which to respond to obtain the information.'" Thus, Helferich expressly included the use of URLs (including shortened URLs) as "covered by its claims."

The above confirmations and allowances have greatly strengthened Helferich's portfolio and rendered more difficult the task for infringers to meet their burden of proving invalidity of the asserted patents. Indeed, Helferich's successes in front of the Patent Office have not gone unnoticed. First, Judge Darrah lifted the stay of the NYT case (and denied NYT Defense Group members' related motions to impose a new stay). Judge Darrah stated:

[E]ven after the third round of reexamination is completed, it is possible some or most claims will remain, though perhaps amended, in the litigation before this Court. ([Helferich's] Motion to Lift Stay at 10). To permit a continued stay in the New York Times case and grant stays in the Other Defendants' cases would cause undue delay and create additional expense and hardship for [Helferich].

June 1, 2012
Page 11



> Permitting stays in these cases would serve only to prejudice the plaintiff,
> [Helferich], and the stays sought by the Defendants are, at best, strategic delay
> tactics. The Motions to Stay in the Other Defendants' cases are denied, and the
> Motion to Lift the Stay in the New York Times case is granted.[10]

In short, the lifting of the stay is will allow Helferich to finally make progress towards a prompt trial on the merits, and effectively moots the NYT Defense Group strategy of filing seriatim reexamination requests and appeals. JetBlue should understand that Helferich intends to continue increasing its licensing fees as it continues to make progress in the litigation and in the Patent Office.

In addition, prior to lifting the stay, Judge Darrah granted Helferich's motion to reassign the J.C. Penney case to himself from Judge Pallmeyer for all purposes.[11] Helferich now expects the J.C. Penney matter to proceed efficiently with the other matters in front of a single judge. As part of that process, Judge Darrah ordered all of the parties to engage in formal mediation before Magistrate Judge Gilbert. As a result of that order, Bon-Ton Stores became the second litigant and first former NYT Defense Group member to agree to a license (Helferich previously completed an agreement with ShopNBC in February, 2012). The settlement discussions with the other defendants (JCPenney, Best Buy, CBS, Bravo, and G4) were unsuccessful, and made clear that the parties have diametrically opposed views of the merits of the outcome of the reexamination proceedings to date and of Helferich's claims. We urge you to monitor and review the record in the combined Chicago (and Arizona) litigations.

Finally, please be advised that Helferich has several other applications that remain pending with important claims directed to wireless content provision and messaging that will, once issued, be asserted against JetBlue (as discussed below). Helferich has filed in each of these cases all of the art and arguments from, among other things, all twelve NYT Defense Group reexams. Upon issuance of the allowed '189 case, Helferich will have an additional 47 claims to assert against content infringers such as JetBlue. Should the other pending content applications be allowed, as we suspect they will, Helferich will have 73 more claims available to assert. Specifically, the following four pending applications cover additional inventions in the field of mobile wireless content provision:

- **12/580,189** – was allowed on April 26, 2012, following consideration of the comprehensive IDS addressing NYT's art and arguments from eight of the reexamination requests (and Helferich recently filed an IDS addressing the ninth, tenth, eleventh, and twelfth requests).

- **12/973,722** - was recently filed as a division of issued Application No. 11/598,202, discussed above.

- **13/109,437** - Helferich recently received a non-final office action that included no prior art rejections; the non-final rejection requests applicant to show support for the pending claims under 35 U.S.C. § 112.

---

[10] *See Helferich Patent Licensing, L.L.C. v. New York Times Co.*, 2012 WL 1813665 (N.D. Ill. 2012).

[11] *See Helferich Patent Licensing, L.L.C. v. New York Times Co.*, 2012 WL 1368193 (N.D. Ill. 2012).

June 1, 2012
Page 12



- **13/210,223** - was recently filed as a division of issued Application No. 11/598,202, discussed above.

Helferich is prepared to review with JetBlue the substantive positions presented in the reexamination requests and Helferich's pending applications, along with the licensing agreement and detailed infringement allegations set forth in the following section. Helferich has conducted hundreds of licensing negotiations, and is able to efficiently and promptly focus JetBlue on the key issues.

We request that JetBlue respond in good faith by promptly indicating that it wishes to amicably and in good faith address the matter. We also request that JetBlue identify whether it believes any errors or misstatements exist in Helferich's submissions to the Patent Office, and that it provide any additional invalidity arguments that it believes are worthy of consideration by Helferich or the Patent Office. In advance, we agree to provide JetBlue's position verbatim to the Patent Office.

## III.   <u>INDUSTRY INFRINGEMENT OF HELFERICH'S CLAIMS</u>

The Helferich portfolio includes fifty-nine (59) issued patents and pending applications having over two thousand issued and hundreds of pending claims, many of which are directed specifically to content provider systems and services such as those offered by JetBlue. As discussed above, the portfolio presently includes at least seven issued patents, one recently allowed application, and three additional pending applications all of which contain claims covering important aspects of mobile wireless content provision and messaging.

To quickly focus JetBlue's review, we direct JetBlue's attention to the following subset of issued, allowed, and pending claims all of which are directed to important aspects of mobile wireless content provision and messaging:

- U.S. Patent No. 7,835,757, claims 1-69;[12]

- U.S. Patent No. 7,499,716, claims 15, 16, 17, 18, 21, 22, 23, 24, 27, 30, 31, 38, 39, 43, 83, 84, 85, 86, 89, 90, 91, 94, 97, 98, 105, 106, and 109;[13]

- U.S. Patent No. 7,280,838, claims 9, 10, 12, 13, 15, 16, 18, 20, 97-101, and 105-110;[14]

- U.S. Patent No. 8,107,601, claims 1, 3, 4, 9-11, 16, and 17;

- U.S. Patent No. 8,116,741, claims 1-3, 4-9, 11-18, 20, 21, 23, 24, 26, and 27;

- U.S. Patent No. 8,134,450, claims 1, 4-7, 13, 16-20, and 25-28;

- U.S. Patent No. 7,155,241, claims 1, 2, 7, 10, 13, 14, 38, 39, 40, 41, 42, 47, 50, 53, 54, 71, 72, 77, 80, 84, and 85;

---

[12] Note the March 29, 2011 and September 6, 2011 Certificates of Correction. *See also* Reexamination Certificate, Control No. 90/009,882 (Apr. 24, 2012).

[13] Note the May 12, 2009 Certificate of Correction and December 13, 2011 Reexamination Certificate.

[14] *See* Notice of Intent to Issue Reexamination Certificate, Control No. 90/009,883 (February 6, 2012).

June 1, 2012
Page 13



- U.S. Patent Appl. No. 12/580,189, claims 149, 152, 154-158, 162-164, 166, 169, 171-175, 179-187, 189, 190, 192-196, 198, 199, 202, and 222-232;

- U.S. Patent Appl. No. 12/973,722, claims 106, 108, 111-114, 116, 125-130, 147, 150, 152-154, 157-161, 163, 164, 167, 169, 170, 171, 174-185, 187-199, 203, and 206-212;

- U.S. Patent Appl. No. 13/109,437, claims 75 and 76; and

- U.S. Patent Appl. No. 13/210,223, claims 134-136 and 147-152.

While the above list is not intended to exhaustively identify all infringed claims, it is more than sufficient for JetBlue to evaluate its exposure under Helferich's patents.  To further assist JetBlue's review, the above subset of claims is generally asserted in commercially significant features relating to the following areas:

1. Content Provision via Links[15] – The Helferich portfolio includes claims variously directed to systems and methods used by content providers to create, store, and cause delivery of electronic messages and related content to mobile phones.  Typically, the content provider stores its content (such as news, coupons, specials, media, etc.) on an internet accessible website, creates a short description of the content, selects and inserts a unique identifier of the content, such as a URL "link" in the message, uses an interface with a notification system (such as various social media sites or messaging services) to disseminate its messages to its customers', followers', and fans' mobile phones via SMS or MMS, and thereafter, receives a request for the content identified by the link and delivers the requested content to the user's mobile phone.

2. Identifiers received from an Identification Service[16] – Content providers use link shortening services (such as bit.ly, tinyurl.com, and the like) from which they receive shortened URLs specifically selected to reduce character usage in messages.

---

[15] *See, e.g.,* U.S. Patent No. 7,835,757 claims 1-69 (discussed in Exhibit JB1); U.S. Patent No. 7,499,716 claims 15, 18, 21, 24, 27, 30, 32, 33, 36-41, 83, 86, 89, 94, 97, 99, 100, and 103-109 (discussed in Exhibit JB2); U.S. Patent No. 7,280,838 claims 9, 10, 12, 13, 15, 16, 18, 20, 99, 101-103, 105, 106, and 108-110 (discussed in Exhibit JB3); U.S. Application No. 12/580,189 claims 149, 155, 158, 162, 163, 166, 172, 175, 179, 180, 182, 183, 184, 185, 186, 190, 192, 193, 194, 195, 199, 202, and 222 (discussed in Exhibit JB8); U.S. Application No. 12/973,722 claims 147, 153, 158-161, 164, 170, 175-179, 181-184, 187-191, 194, 198, and 199 (discussed in Exhibit JB9); U.S. Application No. 13/109,437 claim 75 (discussed in Exhibit JB10), and U.S. Application No. 13/210,223 claims 134, 136, 147, 149, 150, 151, and 152 (discussed in Exhibit JB11).

[16] See, e.g., U.S. Patent No. 7,835,757 claims 1, 6, 11, 24, 29, 37, 47, 52, and 60.

June 1, 2012
Page 14



3. <u>Dynamic Content</u>[17] – Content providers offer dynamic content—content that changes between the time a link (or other identifier) is distributed and the time a request is received, including for example, changing financial information, weather, and product advertising.

4. <u>Time the Content is Available</u>[18] – Content providers often include a time that content is available in their messages, such as "daily deals," time-limited coupons, and the like in which a time the content is available is included in the messages.

5. <u>Error Status Information</u>[19] – Content providers use shortened URLs to keep messages under 140 characters. Such short links use error status information (e.g. HTTP status 301) to direct the recipient to a corrected location (often a longer link) from which to download content.

6. <u>Advertising</u>[20] – Content providers use the Helferich-claimed systems and methods to provide advertising content such as product information, coupons, store finders, and the like.

7. <u>Video</u>[21] – Content providers use the Helferich-claimed systems and methods to provide video content.

8. <u>Acknowledgement Requests</u>[22] – The Helferich portfolio includes claims directed to notifications that include acknowledgement requests. Among other things, the MMS

---

[17] *See, e.g.,* U.S. Patent No. 7,835,757 claims 1, 19, 20, 22, 23, 24, 33, 34, 45, 46, 47, 56, 57, 68, and 69 (discussed in Exhibit JB1); and U.S. Patent No. 8,116,741 claims 1-3, 4-9, 11-18, 20, 21, 23, 24, 26, and 27 (discussed in Exhibit JB6).

[18] *See, e.g.,* U.S. Patent No. 7,835,757 claims 18, 21, 32, 44, 55, and 67 (discussed in Exhibit JB1); U.S. Patent No. 7,499,716 claims 22, 23, 90, and 91 (discussed in Exhibit JB2); U.S. Patent No. 8,116,741 claims 9 and 18 (discussed in Exhibit JB6); U.S. Patent No. 8,134,450 claims 1, 4, 5, 6, 13, 16, 17, 18, and 20 (discussed in Exhibit JB7); U.S. Application No. 12/580,189 claims 157 and 174 (discussed in Exhibit JB8); U.S. Application No. 12/973,722 claims 157 and 174 (discussed in Exhibit JB9); and U.S. Application No. 13/210,223 claim 148 (discussed in Exhibit JB11).

[19] *See, e.g.,* U.S. Patent No. 8,107,601 claims 1, 3, 4, 9-11, 16, and 17 (discussed in Exhibit JB5); U.S. Patent No. 8,116,741 claims 11, 12, 20, 21, 23, 24, 26, and 27 (discussed in Exhibit JB6); U.S. Patent No. 8,134,450 claims 25-28 (discussed in Exhibit JB7); U.S. Application No. 12/580,189 claims 223-232 (discussed in Exhibit JB8); and U.S. Application No. 12/973,722 claims 206-212 (discussed in Exhibit JB9).

[20] *See, e.g.,* U.S. Application No. 12/580,189 claims 164 and 181 (discussed in Exhibit JB8); and U.S. Application No. 12/973,722 claims 163, 180, 192, 197, and 212 (discussed in Exhibit JB9).

[21] *See, e.g.,* U.S. Patent No. 7,499,716 claims 17 and 85 (discussed in Exhibit JB2); U.S. Patent No. 7,280,838 claim 20 (discussed in Exhibit JB3); U.S. Patent No. 7,155,241 claims 47 and 77 (discussed in Exhibit JB4); U.S. Patent No. 8,134,450 claims 7 and 19 (discussed in Exhibit JB7); U.S. Application No. 12/580,189 claims 156 and 173 (discussed in Exhibit JB8); U.S. Application No. 12/973,722 claims 154, 171, 185, 193, 196, and 211 (discussed in Exhibit JB9); and U.S. Application No. 13/210,223 claim 135 (discussed in Exhibit JB11).

June 1, 2012
Page 15



standard provides a field into which delivery or read report requests are to be inserted. Thus, content providers using MMS as a transport for media, advertising, or other content likely infringe such claims.

9. <u>Performing Commands on Available Content</u>[23] – The Helferich portfolio includes claims directed to notification of content from which content providers can receive commands to perform on the content. Among other things, the MMS standard enables the receipt of commands to reply to content, forward content, or delete content. Thus, content providers using MMS as a transport for media, advertising, or other content likely infringe such claims.

10. <u>Priority of the Content</u>[24] – The Helferich portfolio includes claims directed to notifications of content indicating the priority (e.g., importance) of the content. Among other things, the MMS standard provides a field into which the priority of notified content is inserted. Thus, content providers using MMS as a transport for media, advertising, or other content likely infringe such claims.

11. <u>Location-Based Services</u>[25] – The Helferich portfolio includes claims directed to location-based services for mobile phones. Content providers use location information received to customize content delivered to the mobile phone, including for example, map information, directions, restaurants, and store information.

12. <u>Instant Messaging on Mobile Devices</u>[26] – The Helferich portfolio includes claims instant messaging in which the presence of mobile devices as connected to or logged into instant messaging services is reported to other users.

The claim infringement charts identified in the footnotes above are intended to demonstrate to JetBlue how this subset of Helferich's issued, allowed, and pending claims are infringed by the referenced operations. We recognize that JetBlue may not presently implement all of the above-described forms of mobile content/message provision. However, as explained in the following section, JetBlue is clearly using several of the infringing systems and methods. Based on its rapidly expanding use of the "Mobile Channel," we expect that JetBlue will, over the life of Helferich's patents, implement virtually all of the infringing methods of delivering content to mobile phones. Again, Helferich is prepared in the good faith and settlement context to discuss with JetBlue in detail each of the above listed claims and the manner in which they are alleged to be infringed by the identified processes.

---

[22] *See, e.g.,* U.S. Patent No. 7,835,757, claims 14, 40, and 63 (discussed in Exhibit JB1); U.S. Patent No. 7,155,241 claims 1, 2, 10, 13, 14, 38, 39, 40, 41, 42, 40, 53, 54, 71, 72, 80, 84, and 85 (discussed in Exhibit JB4); and U.S. Application No. 12/973,722 claim 195 (discussed in Exhibit JB9).

[23] *See, e.g.,* U.S. Patent No. 7,499,716, claims 16, 31, and 43 (discussed in Exhibit JB2).

[24] *See, e.g.,* U.S. Application No. 12/973,722 claim 203 (discussed in Exhibit JB9).

[25] *See, e.g.,* U.S. Application No. 12/580,189 claims 152, 154, 169, 171, 187, 189, 196, and 198 (discussed in Exhibit JB8); and U.S. Application No. 12/973,722 claims 125, 126, 127, 128, 129, 130, 150, 152, 167, and 169 (discussed in Exhibit JB9).

[26] *See, e.g.,* U.S. Application No. 12/973,722 claims 106, 108, 111-114, and 116 (discussed in Exhibit JB9).

June 1, 2012
Page 16



## IV.   JETBLUE'S INFRINGEMENT OF HELFERICH'S CLAIMS

### A.   Overview of JetBlue's Wireless Content Provision

JetBlue is one of the country's largest passenger airlines and brought in over $3.7 billion in revenue in 2010.[27]  JetBlue has made mobile marketing an integral part of its strategy through mobile websites, mobile apps, and social media.  In fact, JetBlue has issued numerous statements indicating its commitment to the use of mobile marketing:

- Jonathan Stephen, head of mobile at JetBlue, commented, "[JetBlue is] going to start shifting to giving users specific content and leveraging information from their mobile devices."[28]

- Michael Stromer, vice president of customer connections at JetBlue, said, "For us, we want to be where our customers are.  The initial mission behind JetBlue is to bring humanity back to air travel, and we are trying ot do that with these [mobile] initiatives.  When we think about mobility, we want to influence customers while they are in the mode of travel."[29]

As part of its mobile marketing, JetBlue has created mobile websites.  These sites allow users to book flights, view existing reservations, check-in to upcoming flights, view travel alerts, and search for the latest JetBlue deals.   The JetBlue mobile website is located at http://mobile.jetblue.com.  JetBlue automatically directs mobile users attempting to access the desktop website (www.jetblue.com) from their phones to the mobile optimized content at the URL above.

In addition, JetBlue has created an iPhone app.[30]  The JetBlue apps enable users to book travel arrangements, check-in to upcoming flights, view existing itineraries, and receive travel updates via push notifications.[31]   Additionally, the JetBlue Bookstore app uses GPS to assist customers in locating the nearest airport that JetBlue during the booking process.[32]  The app also allows for messages to be sent to inform others of travel arrangements through the "Pick Me Up" feature.

Further, JetBlue creates, formats, and causes delivery of electronic messages and related content to mobile phones via social media, such as Twitter, Facebook, YouTube, Google+ and the like.[33]  The social media offerings have become a critical part of JetBlue's marketing efforts because they reach a large number of mobile users.  For example, virtually all of JetBlue's properties have their own "home page" websites.  Most of those, in turn, have links directly to

---

[27] See Reference JB1.

[28] See Reference JB2.

[29] Id.

[30] See References JB3 and JB4.

[31] See Reference JB4.

[32] See Reference JB5.

[33] See, e.g., References JB6 and JB7 showing two official Twitter pages; Reference JB8 showing the official Facebook page; and Reference JB9 showing the official YouTube page.

June 1, 2012
Page 17



their respective Facebook, Twitter and other social media sites. JetBlue uses those social channels to create and cause messages to be distributed by SMS to thousands of customers, subscribers, and fans. The messages are written and formatted by JetBlue to be compatible with SMS messaging and to include selectable links directing mobile users to JetBlue's content.

As with its other mobile offerings, JetBlue's infringement via the social channel is expanding rapidly. Industry analysts indicate that "businesses of all sizes are beginning to understand the major benefits of social networking and are readily adopting this essential communications and marketing tool to proactively reach consumers and customers on-the-go."[34] Corporate spending and use of the mobile channel, including via social networks, is accelerating rapidly.[35] It is now expected that social media will be one of the fastest growing marketing channels and become the third-largest interactive marketing spend category.[36] Social media's adoption of mobile features, such as SMS messaging, is also well known.[37] For example, reports over the past several years indicate that nearly 50% of Twitter usage is via mobile and that anywhere from 8-19% of all Twitter interactions are via SMS text messaging.[38] Further, Twitter, which started as a simple SMS-text service, attracts 300,000 new users every day, and many of these new users access Twitter via their mobile devices and through SMS text messaging.[39]

Recognizing this mass adoption of social media and social media's integration with mobile, many content providers have elected to exclusively use social media sites like Twitter and Facebook rather than text message short codes to reach mobile users. With these social media sites, content providers often reach many more mobile users and can operate multiple distinct feeds that each relate to a separate specific product, offering, or brand. However, delivering content to mobile users through social media rather than short codes does not absolve these companies of liability to Helferich. As discussed in further detail below, Helferich's claims are specifically drafted to capture the activities of content providers. It is the providers that create the available content, create the short headline or description of the content and select the URLs posted and disseminated to the content provider's social media subscribers, not the social media conduits.

The programs described above demonstrate JetBlue's commitment to the mobile channel. As more and more users become connected with multimedia capable mobile devices, JetBlue's involvement in mobile marketing is expected to grow. Helferich's favorable licensing rates reflect that mobile content provision is in its infancy, and that JetBlue's historic liability is likely relatively limited in time. As we have repeatedly emphasized in this notice letter, ***JetBlue can***

---

[34] *See, e.g.,* Reference JB10; *see also, e.g.,* Reference JB11 discussing growth of mobile marketing via social networking.

[35] *See, e.g.,* Reference JB12.

[36] *See, e.g.,* Reference JB13 showing worldwide mobile advertising spending to increase from $1.0B in 2008 to 2.4B in 2009, with projections to reach $6.5B by 2012 in the U.S. alone.

[37] *See, e.g.,* References JB14 through JB16 (predicting that 5% of all text messages would be related to social network interaction).

[38] *See, e.g.,* References JB14 through JB18.

[39] *See* Reference JB17.

June 1, 2012
Page 18



*expect Helferich's licensing rates to increase as JetBlue's infringement exposure continues to grow, as more companies sign licenses, as more Helferich patents issue, and if litigation is necessary to address the issue.*

**B.** **Infringement Areas 1, 2, 3, 4, 5, 6, and 7: Content Provision via Links, Identification Services, Dynamic Content, Time Content is Available, Error Status Information, Advertising, and Video.**

The sampling of patents and claims identified in Infringement Areas 1-7 above address: (1) creating, formatting, and causing delivery of electronic messages with identifiers of stored content to mobile phones, (2) use of identifiers received from an identification service, (3) creating, formatting, and causing delivery of electronic messages with identifiers of dynamic content to mobile phones, (4) creating, formatting, and causing delivery of electronic messages with identifiers of content that include the time content is available to mobile phones, (5) use of links that give rise to error status information, (6) creating, formatting, and causing delivery of electronic messages with identifiers of advertising content, and (7) creating, formatting, and causing delivery of electronic messages with identifiers of video content.

As shown in detail below, JetBlue variously infringes the identified claims by offering, among other things:

- JetBlue's extensive social media marketing campaigns.

*Area 1: Content Provision via Links.*   Infringement in Area 1 relates to creating, formatting, and causing messages to be transmitted to mobile devices, where the alert messages contain rich links to additional content.  In particular, as shown below, JetBlue creates and initiates transmittal of messages to mobile phones.  These alerts include a URL that specifies a domain name as well as a content identifier code.  JetBlue causes its content to be stored at the location identified by the URL.  Providing these URLs enables users to respond by requesting JetBlue's internet-accessible content be delivered to their mobile phones.  In response to such requests, JetBlue delivers its content to mobile phones.

For example, JetBlue uses its rapidly expanding social media presence to create and initiate the transmission of thousands of mobile messages daily,[40] the majority of which infringe Helferich's claims.  JetBlue's homepage ((www.jetblue.com) refers users to JetBlue Facebook and Twitter pages.[41]  As JetBlue knows, many fans or followers elect to receive JetBlue's Twitter "tweets" via SMS – indeed, Twitter was created for that very purpose.

Set forth below in Figure 1 is JetBlue's official Twitter site showing the options to receive updates via SMS:

---

[40] *See, e.g.*, References JB6 through JB7 showing two official Twitter pages and Reference JB8 showing the official Facebook page.

[41] See https://www.facebook.com/JetBlue

P: 312.752.4357 | F: 312.896.5633 | E: info@PatentIt.com | A: 55 W. Monroe Street, Suite 3210, Chicago, IL 60603

June 1, 2012
Page 19





**Figure 1.** Listing of recent official JetBlue alerts via Twitter.

Through the site, JetBlue creates and causes messages to be delivered that contain specific URLs identifying JetBlue content, which JetBlue delivers to a mobile phone upon a request (using the provided URL) to do so.   Recent examples of such messages ("tweets") include the following:

- JetBlue Airways: Would you like to see JetBlue service from DCA to SJU and AUS? Here's how you can help us get it: bit.ly/JBCap2Cap #JBCap2Cap

- JetBlue Cheeps: The Love-A-Fare Sale bit.ly/wIX8fd Today only for travel 2/21-3/3 Rest. Apply

- JetBlue Cheeps: Special offer! Long Beach to Seattle, Portland or Anchorage from $80 one-way. Book by 2/10. cot.ag/weGIeS Rest. Apply

June 1, 2012
Page 20



- JetBlue Cheeps: Again, no Cheeps this week, but here are $24 fares one-way departing San Juan, PR (SJU) cot.ag/zG96Aa Rest. Apply.

- JetBlue Cheeps: $119 JFK to LAX next Sat., Mon. or Tues. 25 seats avail or til 6 pm EDT. bit.ly/JBCheeps Taxes, Fees, Rest. Apply

In total, JetBlue's Twitter feeds have over 1.9 million total followers.[42]  Conservatively, assuming that JetBlue posts to Twitter only one update a day through just its JetBlue Cheeps feed, JetBlue causes more than 275,000 messages a day to be sent to its followers, resulting in over 1.9 million messages a week, and over 100 million messages a year.  Assuming further that only 10%, or 10 million, are directed to subscribers via SMS, under Helferich's present royalty rate of $15 per 1000 messages, JetBlue's liability would be approximately $150,000 per year, and growing rapidly.  This estimate is quite conservative, with published reports indicating that 19% of users access Twitter via SMS[43] and that 40% of Twitter usage is via mobile.[44]

It is clear that JetBlue creates the content identified in these messages, causes the content to be stored in an accessible manner, creates the messages describing the content, creates the identifiers inserted in the messages, posts the messages to its social media sites, and replies to the request from its mobile fans and followers to deliver the content, as explained in more detail below.

*__Area 2: Identifiers Received from an Identification Service.__*  Infringement Area 2 relates to creating, formatting, and causing messages to be transmitted to mobile devices that include system identifiers received from an identification service, such as shortened links received from services such as bit.ly, tinyurl.com, and the like.  Virtually all of the URLs used by JetBlue were received by JetBlue from such an identification service.  For example, as shown below, JetBlue created, formatted, and caused to be delivered messages with the following shortened URLs received from an identification service:

- http://t.co/Pmlu1lv5

- http://t.co/7WeTM0EM

*__Area 3: Dynamic Content.__*  Infringement in Area 3 relates to creating, formatting, and causing messages to be transmitted to mobile devices, where the alert messages contain identifiers of dynamic content that changes or is updated by JetBlue in the time after the URL is caused to be sent and before the content is requested by a mobile user.  For example, when JetBlue directs alert recipients to websites that include comment areas, JetBlue updates the available content after initiating its notifications and before the available content is requested. Upon request, JetBlue delivers the most up-to-date version of the content.

Again looking specifically at JetBlue's use of the social media channel, Helferich found the following message created by JetBlue with identifiers back to dynamic JetBlue content, and caused to be sent to JetBlue fans and followers:

---

[42] *See* References JB6 and JB7 showing two official Twitter pages.

[43] *See* Reference JB18.

[44] *See* Reference JB19 and JB20.

June 1, 2012
Page 21









**Figures 2, 3, and 4.**  The above message is an example of an SMS message created and caused to be delivered by JetBlue containing a specific URL identifying JetBlue content, which is delivered to a mobile phone upon a request (using the provided URL) to do so.  The content is dynamic for numerous reasons, including an updating JetBlue news ticker "The Blue Ticker" (as highlighted in Fig. 4) and an automatically updating comments thread at the bottom of the article (Fig. 5).

By way of further example, Helferich refers to the following message created by JetBlue with identifiers back to dynamic JetBlue content, and caused to be sent to JetBlue opt-in message recipients:







**Figures 5, 6, and 7.**  The above message is an example of an SMS message created and caused to be delivered by JetBlue containing a specific URL identifying JetBlue content, which is delivered to a mobile phone upon a request (using the provided URL) to do so.  The content is

June 1, 2012
Page 22



dynamic for numerous reasons, including an updating count of the number of deal tweets, +1s, and likes (as highlighted in Fig. 5) and the fact that the content will change once the deal expires.

*__Area 4: Time the Content is Available.__*   The Helferich portfolio further includes claims relating to creating, formatting, and causing messages to be transmitted to mobile devices that include the time that content is available.  Content providers frequently include a time that the content identified by the URL is available, including for example, in the context of "daily deals," time-limited coupons, and the like.

For example, we refer you to the following messages that are created by JetBlue with an indication of an expiration time or date:







**Figures 8, 9, and 10.**  The above message provides an example of an SMS message created and caused to be delivered by JetBlue containing a specific URL identifying the JetBlue content, and which JetBlue delivered to a mobile phone upon a request (using the provided URL) to do so. The message indicates the content is time sensitive with "until 3/16."  As shown in Figure 9, the content was available on the date of the promotion.  As shown in Figure 10, the content now reflects that the promotion has ended.

*__Area 5: Error Status Information.__*   Infringement in Area 5 relates to creating, formatting, and causing messages to be transmitted to mobile devices, where the alert messages contain links that use error status information to direct users to a corrected location from which to download content.   In many cases, JetBlue's messages include a short link such as "http://bit.ly/???."  These links use error status information (e.g., HTTP status 301) to direct the recipient to a corrected location from which to download content.   Such short links enable content providers, like JetBlue, to shorten the overall character count of their messages for purposes of SMS messaging.

For example, we refer you to the following messages that are created by JetBlue and that use error status information to direct the recipient to a corrected location:

June 1, 2012
Page 23







**Figures 11 and 12.**

Figure 11 provides an example of an SMS message created and caused to be delivered by JetBlue containing a specific URL identifying the JetBlue content shown in Figure 12, which JetBlue delivered to a mobile phone upon a request (using the provided URL) to do so.  The message includes a short link that uses status information to redirect to content at http://www2.jetblue.com/deals/go-more-places/?source=TW20120315 as shown in Figure 12.

*__Area 6: Advertising__*.  JetBlue uses the Helferich-claimed systems and methods described above to provide advertising content such as product information, coupons, store finders, and the like.  Such additional offerings infringe claims in Area 6 discussed in Section III above.

*__Area 7: Video__*.  JetBlue uses the Helferich-claimed systems and methods described above to provide video content.   Such additional offerings infringe claims in Area 7 discussed in Section III above.

*__To be clear__*, JetBlue's activities (including those referenced in the immediately preceding sections directly infringe Helferich's claims.   In particular, it is JetBlue that performs every element of Helferich's claims.  For example, we direct JetBlue's attention to the claims of the '757 patent (claim 1 shown below):

1. A method that communicates content from a content provider utilizing a content notification system, through a mobile radiotelephone network to a cellular phone, the content notification system: (i) including an interface to a home location registry, (ii) configured to process data into a paging call suitable for transmission to the wireless communication device via short message service ("SMS") messaging, and (iii) configured to transmit the paging call to the cellular phone; the method comprising:

(a) **the content provider causing content available for delivery to a cellular phone to be stored** at one of a plurality of independently identifiable internet-accessible storage locations;



(b) **the content provider receiving a system identifier address code** that identifies the internet-accessible storage location at which the content is stored from an identification service;

(c) **the content provider causing a message intended for the cellular phone to be created**, the message including: (i) an identifier of the content, (ii) the system identifier address code, (iii) a type identifier indicating the content's type, and (iv) the name of the content provider; wherein the content is not included in the message;

(d) **the content provider causing communication from the content notification system of a paging call** including the content identifier and intended for the wireless communication device via SMS messaging; and

(e) **the content provider causing the content to be updated**;

(f) **the content provider receiving a request message** transmitted over the mobile radiotelephone network, the request message including (i) data corresponding to the identifier of the content and the system identifier address code received by the wireless communication device, (ii) the address of the cellular phone, and (iii) a command from the cellular phone to receive to the content; and

(g) **the content provider**, subsequent to receiving the request message, **causing the updated content to be delivered** to the wireless communication device via the mobile radiotelephone network.

As indicated by the bold and underlined portions above, the claim is specifically drafted to recite the acts of a content provider, like JetBlue. It is JetBlue, and not third parties, that actually creates and stores its content (such as web pages), causes a notification to be sent to its "opt-in" subscribers, causes the content to change, and causes the changed content to be transmitted. Helferich is not aware of a third party vendor (including social media providers, mobile alert providers, and the like) that performs every element of the above claim.

To further clarify, set forth below you will find an extremely detailed step-by-step analysis of what is involved when JetBlue sends an infringing message. There are numerous steps taken by JetBlue's employees directly, which result in infringement of Helferich's claims:

1. JetBlue's employee (likely in the marketing department) drafted an advertisement, video, promotion, or other JetBlue content.

2. JetBlue's employee causes the content to be stored on its website by saving it in a web server such as "http://www.company.com/location/of/the/content."

3. JetBlue's employee obtains a shortened link such as "http://bit.ly/xxxx," for example, by using either a web interface or API interface with a service such as Bitly.

4. If using a web interface:

   a. JetBlue's employee pastes the long URL of the content into the webpage and clicks "Shorten" (for Bitly), or carries out similar steps involving a web interface if using another service.

   b. Thereafter, JetBlue's employee receives a short link to the JetBlue content.

June 1, 2012
Page 25



5. If using the API, such as the API provided by Bitly (which allows for enhanced automation of the process):

    a. JetBlue's employee first obtains an API key from Bitly (or another service).

    b. JetBlue's employee logs into the service and connects to the appropriate page. For example, if using Bitly, the employee connects to http://bitly.com/a/ your_api_key.

    c. To use the key, JetBlue's employee authenticates the key. For example, if using Bitly, JetBlue's employee authenticates the key using the Open Authentication (OAUTH) protocol described in Bitly's API documentation.

    d. Once authenticated, JetBlue's employee uses the API to request a short link. For example, if using Bitly, the employee uses an HTTP GET command that includes the specified REST API "/v3/shorten."

    e. The program used by the JetBlue employee connects to the service's server (such as the server at https://api-ssl.bitly.com/ for Bitly), and submits the following, or similar, HTTP GET command:

> GET
> /v3/shorten?access_token=█████████████
> █████&longUrl=http%3A%2F%2Fwww.company.com%2Flocat
> ion%2Fof%2Fthe%2Fcontent

    f. In response to the above command, the JetBlue program would receive a short URL such as: http://bit.ly/xxxx

6. Thereafter, JetBlue's employee drafts the summary text (of not more than 140 characters) relating to the content (e.g., "Final Week! Save up to $130 on hot deals:").

7. JetBlue's employee adds the shortened URL to the summary text and initiates and causes distribution of the message via a web interface or an API.

8. If using a web interface:

    a. JetBlue's employee types or pastes the text and the shortened URL into the Twitter status update field and then clicks "Tweet" to cause the message to be processed and sent.

9. If using the API:

    a. JetBlue's employee first obtains its API key by accessing http://dev.twitter.com to generate a token for the new application that uses the Twitter API.

    b. JetBlue's employee authenticates using the API key.

    c. Once authenticated, JetBlue's employee submits JetBlue's messages via the API using the "POST statuses/update" REST API command thereby initiating and causing the transmission of the update to JetBlue's followers.

June 1, 2012
Page 26



10. Thereafter, JetBlue receives a GET request for the content at the JetBlue server storing the content.

11. Upon JetBlue's server receiving the GET request, the server causes the content to be transmitted to (and received by) the mobile user.

The above messages would be received via SMS by any of JetBlue's Twitter or Facebook followers that elected to receive updates via SMS.

Moreover, JetBlue can choose ***not*** to infringe Helferich's claims, including by initiating messages that do not include links (such as URLs). For example, JetBlue created and caused to be transmitted the following non-infringing SMS messages to its subscribers via Twitter:[45]

- JetBlue Cheeps: No cheeps today, enjoy the week!

- JetBlue Cheeps: I guess many are #OverThe405... our special Saturday flights between LGB and BUR are sold out!

***JetBlue knows how to use the existing channels in non-infringing ways and elects not to do so.*** Instead, like many content providers, JetBlue has found significant commercial value in adding links to its messages identifying JetBlue specific content—with the express goal of driving its subscribers to JetBlue's content. In fact, in the ***vast majority of cases*** JetBlue creates customized mobile-formatted messages that include specific URLs to JetBlue's content. For example, JetBlue created and caused to be transmitted the infringing SMS messages shown in the numerous examples herein. Thus, rather than limiting its activities to non-infringing uses, ***JetBlue chooses to infringe by performing all of the claim elements.***

In this regard, we direct JetBlue's attention to the Federal Circuit's decision in *SiRF Technology, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010). In that case, the Court specifically addressed the issue of responsibility for infringement in the context of signal communications from satellites to GPS receivers. The defendants in *SiRF* argued that the asserted claims necessarily involved actions by third parties (i.e., intermediate systems and end users). The Federal Circuit disagreed, stating:

> we do not read the relevant claims as requiring that any of the specified actions be taken by SiRF's customers or by the end users of the GPS devices. … Rather ***the method claims at issue here are drawn to actions which can be performed and are performed by a single party***.

601 F.3d at 1329 (emphasis added). The Court's discussion continued, stating that infringement was found:

> ***because SiRF initiates the process*** of transmitting and communicating, and the files are actually transmitted to the end users. … Here it is true that the "communicati[ng]" or "transmitting" can only occur if the customer forwards the data to the end user and the end user download the data. However, the actions of "forwarding" or "downloading" are not required by the claims, and therefore, the

---

[45] *See* References JB6 and JB7 showing two official Twitter pages.

June 1, 2012
Page 27



fact that other parties perform these actions does not preclude a finding of direct infringement.

*Id.* (emphasis added). The Court concluded that "SiRF indirectly transmits or communicates the files to the GPS receivers and thereby meets these claim limitations." *Id.* at 1330. We believe the same result is mandated here.

Helferich has taken care to draft its claims to capture the direct infringement of content providers such as JetBlue (including its agents or independent contractors) precisely as envisaged by the Federal Circuit:

> The concerns over a party avoiding infringement by arms-length cooperation can usually be offset by proper claim drafting. A patentee can usually structure a claim to capture infringement by a single party. In this case, for example, [the Plaintiff] could have drafted its claims to focus on one entity. The steps of the claim might have featured references to a single party's supplying or receiving each element of the claimed process.

*BMC Resources, Inc. v. Paymentech,* L.P., 498 F.3d 1373, 1381 (Fed. Cir. 2007) (internal citations omitted). Helferich has done exactly that—Helferich drafted its claims to explicitly state that the claim is performed solely by the acts of the content provider.

In addition, Helferich has reviewed the terms of service used by social media providers such as Twitter and Facebook, and other SMS conduits such as Sybase365.[46] According to these terms, the account holder (i.e., JetBlue) is solely responsible for the contents of its messages. In effect, such social media and other SMS services operate as passive conduits through which JetBlue directs its content. ***Such conduits have no control over the contents of the messages. Furthermore, the conduits expressly disclaim liablity for the content created by content providers such as JetBlue.*** The content providers, like JetBlue, ultimately control the content of their pages, for example, by determining whether consumers can post on their Facebook walls or comment on posted content.[47] JetBlue causes the content it wishes to be sent to its mobile customers to be stored at websites, creates the content of its notification messages, provides the URLs for such messages, initiates their communication, and causes the various notificatoin systems to transmit the messages. Accordingly, JetBlue, and not the conduits, is liable for infringement.

***Summary of Infringement Areas 1-7.*** Numerous additional examples demonstrate JetBlue's widespread offering of the infringing systems and methods described above. However, the above examples are sufficient for JetBlue to address Helferich's infringement assertions under Areas 1-7 identified above in Section III. The referenced claim charts demonstrate in detail the manner in which these practices infringe Helferich's asserted content claims.

We believe that JetBlue's commercially significant infringement of claims as discussed above warrants a license fee many multiples of the amount presently offered by Helferich. In

---

[46] *See, e.g.,* http://twitter.com/tos, http://www.facebook.com/terms.php, and https://quickstart.sybase.com/register.php?section=Register.

[47] *See, e.g.,* Reference JB21.

**P:** 312.752.4357 | **F:** 312.896.5633 | **E:** info@PatentIt.com | **A:** 55 W. Monroe Street, Suite 3210, Chicago, IL 60603

June 1, 2012
Page 28



addition, Helferich also expressly places JetBlue on notice of several additional claims covering commercially significant services already in use by JetBlue, as shown below.

### C. Infringement Areas 8, 9, and 10: Acknowledgements, Commands, and Priority

The representative claims identified in Areas 8-10 relate to the features of: (8) notifications with acknowledgement requests, (9) notifications of content on which commands may be performed, and (10) notifications of content including a priority (e.g., importance) of the content.  With respect to acknowledgement requests, the MMS standard provides fields into which delivery or read report requests are to be inserted.  In addition, mobile content delivery via MMS also implicates Areas 9 and 10 referenced above.  For example, the MMS standard enables content providers to receive commands to reply to content, forward content, or delete content.  Finally, MMS also provides a field for the priority of the content. Thus, content providers using MMS as a transport for media, advertising or other content likely infringe the claims identified in Areas 8-10.

### D. Infringement Area 11: Location Based Services

The pending claims in infringement area 11 relate to systems and services provide information to mobile phones based on data received from a location sensor (such as a GPS chip) within a mobile phone.  To the extent that JetBlue's systems provide information (such as "store locator" web pages and the like) based on data received (directly or indirectly) from a GPS chip in a mobile phone, JetBlue will infringe, upon issuance, additional and published Helferich claims from Area 11, identified above.

### E. Infringement Area 12: Instant Messaging on Mobile Phones

The Helferich portfolio further includes pending claims directed to systems and services that detect the presence of mobile phones and report such presence to other devices, including other mobile phones.  To the extent that JetBlue indicates the presence of a first cell phone on a cellular network to a second cell phone by detecting that the first cell phone is on the network and reporting the result to a second cell phone, JetBlue will likely infringe, upon issuance, additional identified and published Helferich claims from Area 12, above.

## V.   LICENSING TERMS

Helferich has for the last few years offered infringing companies in a pre-litigation context their choice of a running royalty or lump sum license.  The lump sum license fee was based on a scale (taken from the acquisitions clause 3(f) of the lump sum agreements) that used a licensee's worldwide revenues as an easily confirmed approximation of the likely use of the patented systems and methods over the remaining term of the Helferich patents (through 2021 in the U.S., as shown below in Appendix 4.  In such cases, the parties agreed that the licensee's worldwide revenues were a "convenient" approximation of the likely infringement of its patents over the full term of the patents.  Most companies preferred this option to the less convenient (and less certain) running royalty option.

However, Helferich has now completed numerous running royalty agreements.  Several of those agreements were signed by companies that approached Helferich to obtain a license that would enable those companies to establish infringing text messaging services for their customers.  Helferich has signed running royalty agreements with several such providers,



including Business Wire (and Berkshire Hathaway), Mobilozophy and ShopText. Those agreements provide licensed message providers with the right to provide otherwise infringing services on behalf of third parties (note, however, ShopText is only licensed to provide infringing services in relation to "text-to-short-code" programs and not in relation to social media activities).

Thus, one option for JetBlue is to use only the foregoing licensed providers (and any new providers that acquire licenses). If you agree to do so, Helferich will consider resolving JetBlue's historic liability for a reasonable fraction of Helferich's existing licensing rates. Please advise us if you wish to discuss this option.

In view of the above, the lump sum option based on worldwide revenues is no longer available. Rather, licensees can elect one of the running royalty options discussed below, or a lump sum that reasonably accounts for estimated use of the patented technology. The three running royalty options are set forth in Appendix 5, below. The terms are consistent with the running royalty agreements already completed by Helferich, as well as those now in negotiation. All three running royalty licenses offered below require payment for a company's past infringement (or a reasonable estimate thereof) as well as accounting and payments as described below moving forward.

First, Helferich is offering to JetBlue one of two "CPM" or "cost per thousand impressions" royalty models. The first model calls for quarterly payments that are computed by applying a negotiated rate of between $20-$25 per 1000 messages that both (1) include the claimed identifiers, and (2) were caused to be sent by the licensee over the respective quarter. This rate applies to messages that were caused to be sent or initiated on behalf of licensee and its customers via both non-social media campaigns (e.g., mobile opt in programs, SMS campaigns, "text-to-short-code" campaigns, etc.), as well as those sent via social media conduits (such as Twitter, Facebook, Google+, etc.).

The second model calls for a slightly lower message rate of approximately $15/1000. However, this model requires the licensee to guarantee Helferich a minimum quarterly payment (in other words, for each quarter, the licensee is required to pay the greater of the running royalty computation or the quarterly minimum). The quarterly minimums required by a particular licensee are dictated by the licensee's annual revenues. As reflected in Appendix 5, the quarterly minimums range from $2,500 (for a company with annual revenues less than $50 million dollars) to $25,000 (for a company with annual revenues greater than $7.5 billion).

Third, and in addition to the above "CPM" models, Helferich is also offering the option of a license under a direct "Cost-per-Click" ("CPC") running royalty rate model. Under the "CPC" model, JetBlue would pay approximately $2 to $3 each time a message recipient "clicks" on the link and accesses licensee's content. This option would require JetBlue to accurately track its "click-through" rate on messages.

While a lump sum option still exists, the license fee price will be determined on case-by-case basis after reviewing historic and estimated future liability under the above models.

Helferich emphasizes that the licensing terms below reflect the rates for companies that respond promptly and in good faith. In fairness to existing licensees, the favorable rates will be adjusted as necessary. For example, those companies that decline a license and require Helferich

June 1, 2012
Page 30



to file suit to address infringement should not receive the same favorable rates accepted by those that sign promptly after receiving notice. Accordingly, Helferich has set forth the "additional factors" seen in Appendix 5 below as a method to *increase* the fee under such circumstances.

To the extent that JetBlue is unwilling to sign a license with Helferich, we suggest JetBlue immediately cease its use of the claimed identifiers in its mobile marketing activities (including its social media services), or in the alternative commit to using only licensed messaging providers.

## VI.   **CONCLUSION**

We have provided JetBlue all of the documents and materials necessary to undertake a complete review of this matter. We are prepared to discuss the basis for our belief that JetBlue infringes the Helferich patents and pending applications, including via an online or in-person meeting. Our technical team is available to discuss the details of the claim infringement charts and any other technical-related issues, should any arise. Our legal team is available to answer any questions relating to the agreement, the presently offered terms, or any other issues.

We look forward to your prompt response. Please contact my Chicago office, with copies via fax (312-752-4357) or email (SteveLisa@PatentIt.com). Thank you.

Very truly yours,

*Steven G. Lisa*

Steven G. Lisa

cc:     Gerald D. Hosier, Esq.
        Leonard Palevsky, Helferich Patent Licensing, LLC